# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| PUTNAM BANK, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| - against- | <u>JURY TRIAL DEMANDED</u> |
| COUNTRYWIDE FINANCIAL CORP., COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE CAPITAL MARKETS, LLC, COUNTRYWIDE SECURITIES CORP., CWALT, INC., CWMBS, INC., BANK OF AMERICA CORP., BAC HOME LOANS SERVICING, LP, NB HOLDINGS CORP., ANGELO MOZILO, DAVID SAMBOL, ERIC SIERACKI, RANJIT KRIPALANI, STANFORD KURLAND, DAVID A. SPECTOR, N. JOSHUA ADLER, AND JENNIFER SANDEFUR, | |
| Defendants. | |

Plaintiff Putnam Bank, by and through its attorneys, bring this action against Countrywide Financial Corporation ("Countrywide Financial"), Countrywide Home Loans, Inc. ("Countrywide Home Loans"), Countrywide Capital Markets, LLC ("Countrywide Capital Markets") formerly known as Countrywide Capital Markets, Inc., Countrywide Securities Corporation ("Countrywide Securities"); and CWALT, Inc. ("CWALT"), and CWMBS, Inc. ("CWMBS") (the "Depositors") (all collectively, "Countrywide" or "the Countrywide Defendants"); Angelo Mozilo, David Sambol, Eric Sieracki, Ranjit Kripalani, Stanford Kurland, David A. Spector, N. Joshua Adler, and Jennifer Sandefur (the "Officer Defendants"); and Defendants Bank of America Corporation ("Bank of America"), BAC

Home Loans Servicing, LP, and NB Holdings Corporation (together "the Bank of America Defendants"), and allege as follows:

## I.    NATURE OF THE ACTION

1.    This action is brought pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"); Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "1934 Act"); and Connecticut General Statute section 36b-4 (the "Connecticut Uniform Securities Act") by Putnam Bank on their own behalf and on behalf of a nationwide class and a Connecticut subclass of all persons and entities (the "Class") who purchased or otherwise acquired interests in Countrywide mortgage pass-through certificates CWHL 2006-HYB2, CWALT 2005-43, CWHL 2006-12, CWALT 2007-1T1, CWALT 2007-12T1, CWHL 2007-J2, CWHL 2007-17 and CWALT 2007-25  (the "Certificates"). The Certificates were sold pursuant to registration statements, prospectuses and prospectus supplements (the "Offering Documents") that contained untrue statements and omissions of material facts, in violation of the 1933 Act, 1934 Act and the Connecticut Uniform Securities Act.

2.    Pursuant to the Offering Documents, Countrywide sold to Plaintiff $33.3 million of Certificates.  The Certificates were issued between August 2005 and September 2007 (collectively, the "Offerings").

3.    The Certificates consist of securitized mortgage loans. The principal and interest payments due to purchasers of the Certificates are secured and derived from borrower payments. As such, the value of the Certificates is directly tied to the value of mortgage loans underlying the Certificates, as well as the repayment of the underlying mortgages.

4.    As borrowers pay the underlying mortgages, distributions are made to Certificate investors through issuing trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates.  If borrowers fail to pay back their

mortgages, default or are forced into foreclosure, the resulting losses flow to the Certificate purchasers.

5.      In 2003, Countrywide began to systematically disregard the mortgage loan underwriting guidelines that are stated in the Certificates' Offering Documents. In order to capture market share and quick profits, Countrywide pressed its sales agents to churn out loans with disregard to borrowers' incomes and assets.   Indeed, Countrywide awarded mortgage brokers handsome commissions for selling the riskiest loans, which carried higher fees, bolstering profits and ultimately the compensation of the bank's executives.

6.      Unknown to Putnam Bank and other purchasers of the Certificates, Countrywide had internally adopted a "matching" strategy that would approve any mortgage product feature offered by a competitor. Numerous mortgages containing the worst features of mortgage products from different competitors were securitized in to the Certificates.

7.      Moreover, Countrywide set up a system whereby any loan would be approved by way of underwriting "exceptions," and coached borrowers on how to apply for loan products that required little or no income or asset verification. Because Countrywide was selling many of these loans to institutional investors, such as Putnam, the Company did not worry about defaults; by the time loans went bad, they were often in other hands.  In this manner, the systemic abandonment of Countrywide's stated underwriting guidelines infected subsequent securitizations of the loans.

8.       Putnam Bank and other institutional investors were made to believe that they were buying highly-rated, safe securities backed by pools of loans with accurately-represented risk profiles.  However, the mortgage loans underlying the Certificates were a toxic mix of loans issued to borrowers that could not afford the properties, and thus subject to default.

9.      The Certificates were marketed to institutional investors – public pension funds, banks, insurance companies, and mutual funds – who were **prohibited** by regulation from purchasing securities not rated "investment-grade."  In order to circumvent

these regulatory requirements, Countrywide employed rating agencies to provide investment-grade ratings for the Certificates.  The ratings assigned by the rating agencies, which were based on inaccurate data and were tainted by conflicts of interest between Countrywide and the rating agencies, were expressly included in the Offering Documents. All of the Certificates purchased by Putnam Bank were rated investment-grade.

10.     Countrywide's material misrepresentations and omissions regarding the riskiness and credit quality of the Certificates, made through the Offering Documents, term sheets, and other written materials, included misrepresentations and omissions regarding (a) the underwriting process of the mortgage loans; (b)  the percentage of borrowers who would be occupying the property being mortgaged; (c) the loan-to-value ratios and (d) rampant "exceptions" to Countrywide's underwriting guidelines.

11.     Putnam Bank purchased over $33.3 million in Countrywide mortgage-backed securities (the "Certificates") between February 2006 and October 2007 in reliance on misrepresentations and omissions in the Offering Documents, as set forth below.

12.     The systemic abandonment of Countrywide's stated underwriting practices has predictably led to soaring default rates in the mortgage loans underlying the Certificates (the "Mortgage Loans").  For instance, despite the fact that the majority of Putnam Bank's Certificates started out with AAA ratings, seven of them are now not even considered to be investment grade. The Certificates' dismal performance is itself strong evidence that the Mortgage Loans were not underwritten according to the procedures represented to Putnam Bank and other investors. With the underlying loans performing so poorly, the market value of Putnam Bank's Certificates has plummeted, causing Putnam Bank to incur significant losses.

II.     **JURISDICTION AND VENUE**

13.     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331. Certain claims asserted herein arise under sections 10(b) and 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 and 20(a) of the 1934 Act. Jurisdiction is conferred by

Section 27 of the 1934 Act and venue is proper pursuant to Section 27 of the 1934 Act. In addition the claims alleged herein arise under sections 11, 12(a)(2), 15 of the 1933 Act. Jurisdiction is conferred by Section 22 of the 1933 Act and venue is proper pursuant to Section 22 of the 1933 Act.

       14.      Venue is proper as Defendants have transacted and do transact business in this District and many of the acts and practices giving rise to Putnam Bank's claims occurred in substantial part in this District. Defendants are also subject to personal jurisdiction in this District.

## III.   **PARTIES**

       15.      Plaintiff Putnam Bank is a federally chartered stock savings bank headquartered at 40 Main Street in Putnam, Connecticut.  Putnam purchased the following Certificates from Defendants:

| Issuing Trust | Registration Statement | Date of Purchase |
|---|---|---|
| CWHL 2006-HYB2 | 333-125963 | 3/2/2006 |
| CWALT 2005-43 | 333-125902 | 2/6/2006 |
| CWHL 2006-12 | 333-131662 | 6/19/2006 |
| CWALT 2007-1T1 | 333-131630 | 1/24/2007 |
| CWALT 2007-12T1 | 333-140962 | 5/18/2007 |
| CWHL 2007-J2 | 333-140958 | 6/7/2007 |
| CWHL 2007-17 | 333-140958 | 8/10/2007 |
| CWALT 2007-25 | 333-140962 | 10/10/2007 |

As a proximate result of Defendants' conduct alleged herein, Putnam Bank has suffered injuries through its purchases of these Certificates.

16.     Defendant Countrywide Financial is a corporation organized under the laws of the State of Delaware with its principal executive offices at 4500 Park Granada, Calabasas, California.  Pursuant to a merger completed on July 1, 2008, Countrywide Financial has been merged into and is now part of Bank of America.

17.     Defendant Countrywide Home Loans, a wholly-owned subsidiary of Countrywide Financial, is a corporation organized under the laws of the State of New York with its principal place of business at 4500 Park Granada, Calabasas, California. Countrywide Home Loans is now part of Bank of America and operates under the trade name "Bank of America Home Loans."

18.     Defendant Countrywide Capital Markets, a wholly-owned subsidiary of Countrywide Financial, is a corporation organized under the laws of the State of California with its principal place of business at 4500 Park Granada, Calabasas, California. Countrywide Capital Markets operates through its two main wholly-owned subsidiaries, Defendant Countrywide Securities Corporation and Countrywide Servicing Exchange. Countrywide Capital Markets is now part of Bank of America.

19.     Defendant Countrywide Securities Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 4500 Park Granada, Calabasas, California. Countrywide Securities is now part of Bank of America.

20.     Defendant CWALT is a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial Corporation with its principal place of business at 4500 Park Granada, Calabasas, California. CWALT was the depositor for certain of the Certificate offerings in which Putnam Bank purchased, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain Certificates purchased by Putnam Bank.

21.     Defendant CWMBS is a Delaware corporation and a limited purpose subsidiary of Countrywide Financial Corporation with its principal place of business at 4500 Park Granada, Calabasas, California. CWMBS was the depositor for certain of the Certificate

offerings in which Putnam Bank purchased, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain Certificates purchased by Putnam Bank.

22.     Defendant Angelo Mozilo was Countrywide Financial's co-founder and served on Countrywide Financial's Board of Directors from 1969 to July 1, 2008. Mozilo also served as Countrywide Financial's Chairman of the Board starting in March 1999, President from March 2000 through December 2003 and Chief Executive Officer from February 1998 to July 1, 2008. Mozilo was a member of Countrywide Financial's Executive Strategy Committee, which, from its creation in 2005, was responsible for establishing and evaluating Countrywide's overall strategic direction and governing its annual planning process. Mozilo also served on Countrywide Financial's Credit Committee and Finance Committee and, as CEO and Chairman of the Board, directly oversaw Countrywide's Ethics and Asset/Liability Committees. Mozilo resigned from Countrywide on July 1, 2008. Mozilo resides in Thousand Oaks, California.

23.     Defendant David Sambol joined Countrywide Financial in 1985. From 1994 to 2003, Sambol was a Managing Director and served as Countrywide Financial's Senior Managing Director and Chief of Production for its loan sector. From 2004 to 2006, Sambol was President and COO of Countrywide Home Loans, where he led all operations and had oversight responsibility for the company.  From 2004 to 2006, Sambol served as Countrywide Financial's Executive Managing Director for Business Segment Operations, heading up all revenue-generating operations at Countrywide Financial, as well as the corporate operational and support units comprised of Administration, Marketing and Corporate Communications, and Enterprise Operations and Technology. From September 2006 through mid-2008, when he retired, Sambol was Countrywide Financial's President and Chief Operating Officer. Beginning in 2007, Sambol was CEO of Countrywide Home Loans and a member of Countrywide Financial's Board of Directors.  Sambol was also a member of several Countrywide Financial committees, including the (a) Executive Strategy Committee;

(b) Asset/Liability Committee; (c) Finance Committee; (d) Audit and Ethics Committee; and (e) Committee to Set Loan Loss Allowance.  Sambol resides in Hidden Hills, California.

24.     Defendant Eric Sieracki served as Countrywide Financial's Executive Managing Director and Chief Financial Officer from April 2005 through Countrywide's merger with Bank of America in 2008. Prior to his appointment as CFO, Sieracki occupied other high-level positions within Countrywide, including key positions with CWALT and CWMBS. Sieracki signed the Registration Statements for the following securitizations: CWALT 2005-43, CWALT 2007-12T1, CWALT 2007-25, CWALT 2007-1T1, CWHL 2006-HYB2, CWHL 2007-J2 and CWHL 2007-17. Sieracki resides in Lake Sherwood, California.

25.     Defendant Ranjit Kripalani joined Countrywide Financial and its subsidiary Countrywide Securities in 1998, as Countrywide Financial's Executive Vice President, and Countrywide Securities' National Sales Manager. He served in numerous high-level positions across Countrywide since, including with CWALT and CWMBS. Kripalani signed the Registration Statements for the following securitizations: CWALT 2007-12T1, CWALT 2007-25, CWHL 2007-J2 and CWHL 2007-17.  Kripalani resides in Manhattan Beach, California.

26.     Defendant Stanford Kurland was President and COO of Countrywide Financial from 1988 until he ceased working for Countrywide Financial on September 7, 2006. He was also Chairman of the Board, President, and CEO of CWALT and CWMBS. Kurland signed the registration statements for the following securitizations: CWALT 2005-43, CWALT 2007-1T1, CWHL 2006-HYB2 and CWHL 2006-12. Kurland resides in Hidden Hills, California and is employed by PennyMac, a mortgage company in Calabasas, California, that invests in distressed mortgages of the type that Kurland helped originate as a Countrywide executive.

27.     Defendant David A. Spector joined Countrywide in 1990 and served as its Executive Vice President of Secondary Markets. He was subsequently promoted to Managing

Director in 2001 and served as Senior Managing Director of Secondary Marketing at Countrywide Financial from 2004 to 2006. He was also a member of the Board of Directors for CWALT and CWMBS. Spector signed the Registration Statements for the following securitizations: CWALT 2005-43, CWALT 2007-1T1 and CWHL 2006-HYB2. Spector resides in Martinez, California. Like Kurland, Spector is also employed by PennyMac.

28.      Defendant N. Joshua Adler served as President, CEO, and was a member of the Board of Directors for CWALT and CWMBS. Adler signed the Registration Statements for the following securitizations: CWALT 2007-12T1, CWALT 2007-25, CWHL 2007-J2 and CWHL 2007-17. Adler resides in Calabasas, California.

29.      Defendant Jennifer Sandefur joined Countrywide Financial in 1994 as Vice President and Assistant Treasurer and was shortly thereafter promoted to Treasurer of Countrywide Home Loans. She served as Senior Managing Director and Treasurer of Countrywide Financial at the time of her departure in 2008. She also held high-level positions with CWALT and CWMBS. Sandefur signed the Registration Statement for the following securitizations: CWALT 2007-12T1, CWALT 2007-25, CWHL 2007-J2 and CWHL 2007-1. Sandefur resides in Somis, California.

30.      Defendant Bank of America Corporation is a Delaware corporation with its principal executive offices at 100 North Tryon Street, Charlotte, North Carolina. Defendants Countrywide Financial, Countrywide Home Loans, Countrywide Capital Markets, and Countrywide Securities all became part of Bank of America following the merger of Countrywide Financial into Bank of America on July 1, 2008.

31.      Defendant BAC Home Loans Servicing, LP is a limited partnership and subsidiary of Bank of America with its principal executive offices at 4500 Park Granada, Calabasas, CA. BAC Home Loans Servicing, LP is identified in mortgage contracts and other legal documents as "BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing, LP."

32.     Defendant NB Holdings Corporation is a Delaware corporation. NB Holdings Corporation is one of the shell entities used to effectuate the Bank of America-Countrywide merger, and is a successor to Defendant Countrywide Home Loans. On July 3, 2008, Defendant CHL completed the sale of substantially all of its assets to NB Holdings Corporation, a wholly-owned subsidiary of Bank of America.

33.     At all relevant times, the Defendants committed the wrongful acts and/or or participated with and/or conspired with the remaining Defendants in the wrongful acts and course of conduct, or otherwise caused the damages and injuries claimed herein, and are responsible in some manner for the acts, occurrences and events alleged in this Complaint. Any allegations about acts of corporate Defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

## IV.     RELEVANT NON-PARTIES

34.     The mortgage loans underlying the Certificates were deposited into issuing trusts. The issuing trusts then issued the Certificates. The issuing trusts (collectively, the "Trusts") are identified in ¶15.  The Trusts periodically distribute payments to investors as specified by the terms of the Certificates.

35.     The Trusts are common-law trusts formed under the laws of the State of New York and are managed by a trustee. The trustee for Offerings of Certificates detailed herein is The Bank of New York, a New York banking corporation.

## V.     CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired the Certificates issued by the Trusts, as set forth in ¶15, supra, pursuant to the materially misleading Offering Documents.  Excluded from the Class are Defendants, the officers and directors of the Defendants, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.     The nationwide class consists of:

> all persons and entities who purchased or otherwise acquired interests in Countrywide mortgage pass-through Certificates CWHL 2006-HYB2, CWALT 2005-43, CWHL 2006-12, CWALT 2007-1T1, CWALT 2007-12T1, CWHL 2007-J2, CWHL 2007-17 and CWALT 2007-25. (the "Nationwide Class")

38.     The Connecticut subclass consists of:

> all Connecticut residents who purchased or otherwise acquired interests in Countrywide mortgage pass-through Certificates CWHL 2006-HYB2, CWALT 2005-43, CWHL 2006-12, CWALT 2007-1T1, CWALT 2007-12T1, CWHL 2007-J2, CWHL 2007-17 and CWALT 2007-25. (the "Connecticut Subclass")

39.     The Nationwide Class and the Connecticut Subclass are referred to herein as the "Class," except as where otherwise indicated.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Defendants and/or Relevant Non-Parties, including, but not limited to their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violations of federal law that are complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3).

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether Defendants violated the federal securities laws; whether the Offering Documents issued by Defendants to promote and sell the Certificates negligently omitted and/or misrepresented material facts about the Certificates; and to what extent the members of the Class have sustained damages and the proper measure of damages for the class.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## VI.   ALLEGATIONS OF FACT

46.     In a mortgage securitization, mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.

47.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the resulting cash flow is distributed to the holders of the mortgage-backed securities ("MBS"), such as the Certificates complained of herein, in order of priority, based on the specific tranche held by each MBS purchase.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.

48.     Traditionally, originators of a mortgage loans, such as Countrywide, were economically vested in establishing the creditworthiness of borrowers and the true value of the mortgaged property before issuing the mortgage loans.  The advent of mortgage loan securitizations, however, fundamentally shifted the risk of loss from the mortgage loan originator to the purchasers of interests in the securitized pool of loans, or MBS.  As a result, the originator no longer has the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan underwriting process.

49.     Many of the loans that Countrywide Home Loans originated were pooled together by the CWALT and CWMBS, and deposited into special purpose entities, or the Trusts, created by Countrywide through the Depositors. The Trusts, here CWHL 2006-HYB2, CWALT 2005-43, CWHL 2006-12, CWALT 2007-1T1, CWALT 2007-12T1, CWHL 2007-J2, CWHL 2007-17 and CWALT 2007-25, in turn, issued Certificates backed by the loans, which were then sold by Countrywide Securities Corporation and other underwriters, by way of the Offering Documents, to institutional investors such as Putnam Bank and the Class.

## A.     Countrywide Systematically Disregarded the Mortgage Loan Underwriting Standards Conveyed to Certificate Purchasers in the Offering Documents

50.     Beginning in 2003 and extending into 2007, Countrywide experienced exponential growth in its subprime mortgage loan origination business.  A subprime mortgage loan is a mortgage loan issued to a borrower with substandard credit.  Subprime loans serve as the vehicle by which lenders can issue loans to borrowers who, for various reasons ranging from poor credit histories to unstable income levels, would not generally qualify for traditional or prime rate loans.

51.     To compensate for the increased risk of making subprime loans, the upfront fees and continuing costs are higher than that of a traditional loan, which made subprime loans attractive to Countrywide.

52.     From 2003 to 2007, Countrywide's senior management instructed loan origination and underwriting employees that the volume of loan originations trumped borrower creditworthiness. Of import here, Countrywide securitized a substantial portion of subprime mortgage loans originated or acquired by Countrywide during this timeframe into the Certificates.

53.     As described herein, in order to meet its volume and market share goals, Countrywide's underwriting practices abandoned any semblance of the standards set forth in the Offering Documents.

54.     According to the SEC, Countrywide, among other things, created a four-tier underwriting process that virtually guaranteed a significant percentage of loans would be approved: Loans were first processed by an automated system that, if it did not approve the loan, would refer it to manual underwriting. The manual underwriter would then attempt to approve the loan under his or her exception authority. If the loan exceeded the underwriter's exception authority, it was then referred to the Structured Lending Desk, where underwriters with broader exception authority attempted to get the loan approved. Finally, if all prior attempts to find an exception failed, it would be referred to the Secondary Markets Structured Lending Desk, where the sole criterion for approving the loan was whether the loan could be sold.

55.     Unknown to Putnam Bank and contrary to Defendants' representations in the Offering Documents, "exceptions" were not based on any countervailing compensating factors. Rather, they were given for the specific purpose of allowing Countrywide to originate more high-fee, high-risk loans, which Countrywide knew could be packaged and sold in the secondary market to investors like Putnam Bank and the Class.

**B.     Countrywide's Material Misrepresentations and Omissions in the Offering Documents**

56.     Defendants' misrepresentations and omissions in the Offering Documents detailed herein are material because they concealed the risk of the mortgage

loans underlying the Certificates.  Defaults on the mortgage loans underlying the Certificates have created the risk that interest payments will cease and/or that purchasers will lose their principal.  In addition, the market value for the Certificates has diminished as the true risk of the mortgage pools underlying the Certificates has come to light.  Defendants' misrepresentations and omissions in the Offering Documents are as follows:

> **1.     Countrywide Concealed Systematic Deviation from the Underwriting Standards Stated in the Offering Documents**

57.     The underwriting process used to form the pools of Mortgage Loans underlying Putnam Bank's Certificates was material to Putnam Bank because, as discussed above, the quality of Mortgage Loans in the pool determines the risk of the Certificates backed by those loans. If a reasonable underwriting process was not actually followed, the chances that the loans had riskier features than what Countrywide claimed (whether due to error, borrower misrepresentation, or otherwise) greatly increases. This made the resulting pool of Mortgage Loans much more risky. The systemic underwriting failure decreased the reliability of all of the information investors have about the Mortgage Loans, and thus greatly increased their risk.

58.     Countrywide represented that it consistently followed a conservative, reliable, reasonable underwriting program. For example, in the Offering Documents for CWHL 2006-HYB2, Countrywide represented that "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWHL 2006-HYB2 Prospectus Supplement, Form 424B5, filed February 27, 2006, at S-88; *see also*, Prospectus Supplement, Form 424B5, for:

| Certificate | Page Number |
|:---:|:---:|
| CWALT 2005-43 | S-74 |
| CWHL 2006-12 | S-34 |

| CWALT 2007-1T1 | S-38 |
|---|---|
| CWALT 2007-12T1 | S-37 |
| CWHL 2007-J2 | S-43 |
| CWHL 2007-17 | S-45 |
| CWALT 2007-25 | S-42 |

59.     The systematic abandonment of any underwriting standards rendered all the above representations false or misleading at the time they were made. Countrywide systematically abandoned its underwriting standards to increase loan volumes without regard to loan quality.

60.     Countrywide systematically ignored borrowers' actual repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans. The Defendants also misleadingly omitted that Countrywide had adopted a "matching" strategy wherein the most aggressive features of its competitors' mortgage loans were aggregated into Countrywide loans and that the salability of mortgage loan on the secondary market was the only underwriting principle.

61.     In addition, Countrywide represented that it made case-by-case exceptions to its underwriting standards, based on compensating factors that increased the quality of a loan application. For example, in the Offering Documents for CWALT 2007-1T1, Countrywide represented that "Exceptions to Countrywide Home Loans' underwriting guidelines may be made *if compensating factors are demonstrated by a prospective borrower.*" [Emphasis added.] CWHL 2006-HYB2 Prospectus Supplement, Form 424B5, filed February 27, 2006, at S-88; *see also*, Prospectus Supplement, Form 424B5, for:

| **Certificate** | **Page Number** |
|---|---|
| CWALT 2005-43 | S-74 |
| CWHL 2006-12 | S-34 |

| CWALT 2007-1T1 | S-38 |
| CWALT 2007-12T1 | S-37 |
| CWHL 2007-J2 | S-43 |
| CWHL 2007-17 | S-45 |
| CWALT 2007-25 | S-42 |

62.     The above statement in the Offering Documents was misleading because exceptions were granted by Countrywide without consideration of any compensating factors.

**2.     Countrywide Misrepresented the Actual Owner-Occupancy Statistics in the Offering Documents**

63.     Owner-occupancy statistics were material to Putnam Bank and other investors because high owner-occupancy rates indicate that the Certificates were safer investments than securities backed by significantly more "second home" or "investment property" mortgages. This is so because homebuyers who actually reside in mortgaged properties are less likely to default than buyers who purchase homes as investments or second homes and live elsewhere.

64.     Each of the Offering Documents contained detailed statistics regarding the Mortgage Loans in the mortgage pool, including the reported owner-occupancy characteristics of the Mortgage Loans. The statistics reported whether the borrowers intended to occupy the properties as owners, or use the properties as investment properties or second homes. For example, in the Offering Documents for CWHL 2006-HYB2, Countrywide represented that among the 1,728 initial Mortgage Loans in the offering, 1,210 of the Mortgage Loans (79.2% of the total) were for primary residences, *i.e.* owner-occupied properties.  CWHL 2006-HYB2 Prospectus Supplement, Form 424B5, filed February 27, 2006, at S-37; *see also*, Prospectus Supplement, Form 424B5, for:

| Certificate | Page Number(s) |
|:---:|:---:|
| CWALT 2005-43 | S-24, S-34, S-45, S-56. S-67 |
| CWHL 2006-12 | S-29 |
| CWALT 2007-1T1 | N/A |
| CWALT 2007-12T1 | A-8 |
| CWHL 2007-J2 | A-7, A-17 |
| CWHL 2007-17 | A-7, A-15, A-23, A-31 |
| CWALT 2007-25 | A-9 |

65.     The above statements were misleading because Countrywide's abandonment of its underwriting practices and coaching of borrowers regarding of how to game the system facilitated the widespread falsification of these statistics. In reality, a far greater percentage of properties were not owner-occupied.

**3.     Countrywide Misrepresented Loan-to-Value Ratios in the Offering Documents**

66.     The loan-to-value ("LTV") ratio is the ratio of a Mortgage Loan's original principal balance to the appraised value of the mortgaged property. The related Combined LTV ("CLTV") takes into account other liens on the property. These ratios were material to Putnam Bank and other investors because higher ratios are correlated with a higher risk of default. A borrower with a small equity position in a property has less to lose if he or she defaults on the loan. There is also a greater likelihood that a foreclosure will result in a loss for the lender if the borrower fully leveraged the property.

67.     For example, in the CWHL 2006-HYB2 transaction, Countrywide represented that the weighted average LTV ratio was 75.4% for "Group 1" Mortgage Loans, 73.2% for "Group 2" Mortgage Loans, 72.8% for "Group 3" Mortgage Loans and 75.0% for "Group 4" Mortgage Loans. CWHL 2006-HYB2 Prospectus Supplement, Form 424B5, filed February 27, 2006, at S-4, S-5; *see also*, Prospectus Supplement, Form 424B5, for:

| Certificate | Page Number(s) |
|:---:|:---:|
| CWALT 2005-43 | S-21, S-32, S-42, S-53, S-64 |
| CWHL 2006-12 | S-5 |
| CWALT 2007-1T1 | S-5 |
| CWALT 2007-12T1 | S-5 |
| CWHL 2007-J2 | S-6, S-7 |
| CWHL 2007-17 | S-6, S-7 |
| CWALT 2007-25 | S-6 |

68.     The key value in the LTV ratio is the appraised value of the mortgaged property.  The Offering Documents represented that one or more *independent* appraisals were obtained for nearly every Mortgage Loan. For example, in the Offering Documents for CWHL 2006-HYB2, Countrywide represented as follows:

> Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from *independent appraisers or appraisal services* for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

[Emphasis added.] CWHL 2006-HYB2 Prospectus Supplement, Form 424B5, filed February 27, 2006, at S-89; *see also*, Prospectus Supplement, Form 424B5, for:

| Certificate | Page Number |
|:---:|:---:|
| CWALT 2005-43 | S-75 |

| CWHL 2006-12 | S-34 |
| CWALT 2007-1T1 | S-38 |
| CWALT 2007-12T1 | S-37 |
| CWHL 2007-J2 | S-44 |
| CWHL 2007-17 | S-46 |
| CWALT 2007-25 | S-43 |

69.     The representations regarding independence were material to Putnam Bank and other investors because they signaled the reliability of the LTV ratios discussed above.

70.     The above representations regarding loan-to-value, combined loan-to-value, and appraisal independence were misleading to purchasers of Certificates. The property values subject to the Mortgage Loans were being artificially and baselessly inflated in order to increase the amount of money that Countrywide could loan to a borrower, rendering the LTV and CLTV statistics false and misleading. The statistics also omitted the effect of additional liens on the property, further rendering the CLTVs misleading. In addition, contrary to its representations in the Offering Documents, Countrywide used affiliated rather than independent appraisers, and that Countrywide was pressuring appraisers to inflate their appraisals.

**4.      Countrywide Misrepresented Its Method For Selecting Mortgage Loans for Securitization in the Offering Documents**

71.     The method by which Countrywide selected Mortgage Loans for securitization into the Certificates, *i.e.* whether Countrywide was keeping higher-quality loans for its own portfolio and securitizing the riskier Mortgage Loans, was material to Putnam Bank and other investors because such a process would flag to investors the poor quality of the loans actually being securitized, regardless of the general underwriting processes that Countrywide supposedly followed.

72.     For example, in the CWHL 2006-HYB2 Offering Documents, Countrywide represented that "the mortgage loans were selected from among the outstanding one to four-family mortgage loans in Countrywide Home Loans' portfolio as to which the representations and warranties set forth in the pooling and servicing agreement can be made and that *the selection was not made in a manner intended to affect the interests of the certificate holders adversely*." [Emphasis added.]    CWHL 2006-HYB2 Prospectus Supplement, Form 424B5, filed February 27, 2006, at S-89; *see also*, Prospectus Supplement, Form 424B5, for:

| Certificate | Page Number |
|---|---|
| CWALT 2005-43 | S-14 |
| CWHL 2006-12 | S-22 |
| CWALT 2007-1T1 | S-31 |
| CWALT 2007-12T1 | S-50 |
| CWHL 2007-J2 | S-34 |
| CWHL 2007-17 | S-36 |
| CWALT 2007-25 | S-33 |

73.     The above misrepresentations were false and misleading because Countrywide kept the least risky loans for its own portfolio and securitized the remaining high-risk pool of loans into the Certificates.

**5.     Countrywide Misrepresented The Proportion of Mortgage Loans Issued Pursuant to Full Documentation Procedures in the Offering Documents**

74.     Whether a loan application was fully documented was material to Putnam Bank and investors. Reduced-documentation loans are riskier because the borrower provides less substantiating information for items such as his or her income and assets. With

less confirmation, it is more likely that there are errors or misrepresentations in the loan file, rendering it more likely that the homebuyer will default.

75.     For example, in the CWHL 2006-HYB2 Offering, the Prospectus Supplement represented that:

> As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

CWHL 2006-HYB2 Prospectus Supplement, Form 424B5, filed February 27, 2006, at S-87; *see also*, Prospectus Supplement, Form 424B5, for:

| Certificate | Page Number |
|:---:|:---:|
| CWALT 2005-43 | S-73 |
| CWHL 2006-12 | S-33 |
| CWALT 2007-1T1 | S-37 |
| CWALT 2007-12T1 | S-36 |
| CWHL 2007-J2 | S-43 |
| CWHL 2007-17 | S-44 |
| CWALT 2007-25 | S-41 |

76.     The Offering Documents materially overstated the percent of underlying loans that were based on a fully-documented basis, and thus materially understated the risk associated with Putnam Bank's Certificates.

### 6.     Countrywide Misrepresented Borrower Debt-to-Income Ratios in the Offering Documents

77.     The ratio of a borrower's debt to his or her income was material to Putnam Bank and other investors because it represents a borrower's ability to afford the mortgage payments at issue, and thus indicates the likelihood of default.

78.     For example, in the CWHL 2006-HYB2 Offering Documents, Countrywide represented that "[u]nder its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%."  CWHL 2006-HYB2 Prospectus Supplement, Form 424B5, filed February 27, 2006, at S-87; *see also*, Prospectus Supplement, Form 424B5, for:

| Certificate | Page Number |
|:---:|:---:|
| CWALT 2005-43 | S-76 |
| CWHL 2006-12 | S-35 |
| CWALT 2007-1T1 | S-40 |
| CWALT 2007-12T1 | S-38 |
| CWHL 2007-J2 | S-45 |
| CWHL 2007-17 | S-46 |
| CWALT 2007-25[1] | S-44 |

79.     The above statistic are misleading because Countrywide's abandonment of its underwriting practices and coaching of borrowers facilitated the widespread falsification of the data underlying the statistics. Indeed, borrowers' claimed income was regularly inflated.

### 7.     The Credit Ratings in the Offering Documents Were Misleading

---

[1]     The CWALT 2007-25 Prospectus Supplement departs considerably from the allowable debt-to-income ratios stated in prior Prospectus Supplements complained of herein, stating "Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to income ratio based on the borrower's total monthly debt of up to 55%."

80.      Each of the Certificates purchased by Putnam Bank received a rating purportedly indicating the rating agencies' view of the risk profile of the securities. The ratings were material to investors, including Putnam Bank, because the ratings were important to investors in making their investment decisions. Moreover, the Certificates would have been unmarketable to many institutional investors who are *prohibited* by regulation from purchasing securities not rated "investment-grade."

81.      The Offering Materials represented that the rating agencies conducted an analysis that was designed to assess the likelihood of delinquencies and defaults in the underlying mortgage pools. For example, the Offering Documents for CWHL 2006-HYB2 stated that:

> It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P") and Aaa by Moody's Investors Service, Inc. ("Moody's"). It is a condition to the issuance of the Class M, Class B-1 and Class B-2 Certificates that they be rated at least Aa2, A2 and Baa2, respectively, by Moody's and at least AA, A and BBB, respectively, by S&P. The depositor has requested that S&P and Moody's maintain ongoing surveillance of the ratings assigned to the offered certificates in accordance with their respective policies, but we cannot assure you that either S&P or Moody's will continue its surveillance of the ratings assigned to the offered certificates.
>
> The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates. The ratings on the Notional Amount Certificates do not address whether investors will recoup their initial investment. The rating assigned by Moody's to the Class A-R Certificates only addresses the return of its Class Certificate Balance.

The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates. The ratings on the Notional Amount Certificates do not address whether investors will recoup their initial investment. The rating assigned by S&P to the Class A-R Certificates only addresses the return of its Class Certificate Balance.

CWHL 2006-HYB2 Prospectus Supplement, Form 424B5, filed February 27, 2006, at S-144; *see also*, Prospectus Supplement, Form 424B5, for:

| Certificate | Page Number |
|---|---|
| CWALT 2005-43 | S-113 |
| CWHL 2006-12 | S-78 |
| CWALT 2007-1T1 | S-8, n. 2 |
| CWALT 2007-12T1 | S-106, S-107 |
| CWHL 2007-J2 | S-121 |
| CWHL 2007-17 | S-115 |
| CWALT 2007-25 | S-105, S-106 |

82.     The above statements are misleading because the supposedly-independent ratings given by the major credit rating agencies were based on, in many instances, incomplete and error-ridden loan data provided to the agencies by Countrywide.

## VII.   SCIENTER

83.     The allegations below are made in support of Plaintiffs' 1934 Act and Connecticut Uniform Securities Act claims, not in support of Plaintiffs' 1933 Act claims, which are based solely on strict liability and negligence.

84. In June 2009, the U.S. Securities Exchange Commission ("SEC") initiated a civil action against Mozilo, Sambol, and Sieracki styled *S.E.C. v. Mozilo, No. CV 09-3994* (C.D. Cal.). On September 16, 2010, the district court denied the defendants' motions for summary judgment. The District Court found that the SEC raised genuine issues of fact as to, among other things, whether the defendants had misrepresented the quality of its underwriting processes:

> ***The SEC has presented evidence that these statements regarding the quality of Countrywide's underwriting guidelines and loan production were misleading*** in light of Defendants' failure to disclose, *inter* alia, that: (1) As a consequence of Countrywide's "matching strategy," Countrywide's underwriting "guidelines" would end up as a composite of the most aggressive guidelines in the market ... and (2) Countrywide routinely ignored its official underwriting guidelines, and in practice, Countrywide's only criterion for approving a loan was whether the loan could be sold into the secondary market.
>
> For example, Countrywide's Chief Risk Officer, John McMurray, explained in his deposition that Countrywide mixed and matched guidelines from various lenders in the industry, which resulted in Countrywide's guidelines being a composite of the most aggressive guidelines in the industry ....
>
> SEC has also presented evidence that Countrywide routinely ignored its official underwriting to such an extent that Countrywide would underwrite any loan it could sell into the secondary mortgage market. According to the evidence presented by the SEC, Countrywide typically made four attempts to approve a loan .... According to the testimony of the Managing Director of Countrywide Home Loans' Secondary Marketing Division, once the loan was referred to Countrywide's Secondary Markets Structured Lending Desk, the sole criterion used for approving the loan was whether or not the loan could be sold in the secondary market. As a result of this process, a significant portion (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines ....
>
> ***In light of this evidence, a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines ....***

*S.E.C. v. Mozilo, et al., No. CV* 09-3994, 2010 WL 3656068, at* 10 (C.D. Cal. Sept. 16, 2010) (emphasis added). Mozilo, Sambol, and the third defendant, Eric Sieracki, subsequently settled with SEC prior to trial.

85.     The district court found a triable issue of fact as to the question of scienter:

> Here, the SEC has presented evidence from which a reasonable jury could conclude that Defendants possessed the requisite scienter. For example, the SEC has demonstrated that Defendants were aware that Countrywide routinely ignored its underwriting guidelines and that Defendants understood the accompanying risks .... The SEC has also presented evidence that Sambol was aware that Countrywide's matching strategy resulted in Countrywide's composite guidelines being the most aggressive guidelines in the industry ....
>
> Moreover, in addition to demonstrating that Defendants were aware of the facts which made their statements misleading, the SEC has presented evidence that Sambol and Sieracki knew that Countrywide's Chief Risk Officer John McMurray firmly believed that Countrywide should include greater risk disclosure in its SEC filings ....
>
> ***Accordingly, the SEC's evidence is sufficient to raise a genuine issue of material fact with respect to Defendants' scienter, and summary judgment is inappropriate.***

*S.E.C. v. Mozilo*, 2010 WL 3656068, at *16-20 (emphasis added).

86.     The SEC recently made public many of Countrywide's internal documents and communications. The documents not only demonstrate that Countrywide's underwriting failures were systemic, implicating all of their loans generated at this time, but often directly deal with the same exact type of loans, products, and processes underlying Putnam Bank's Certificates.

87.     Countrywide knew the loans it was placing into the Mortgage Loan pools underlying Putnam Bank's and the Class's Certificates were failing basic underwriting standards. According to the SEC, Defendants Mozilo, Sambol and Sieracki knew that a high percentage of the loans Countrywide originated were outside Countrywide's already widened underwriting guidelines.

88.     According to the SEC, Countrywide depended on its sales of mortgages into the secondary market as an important source of revenue and liquidity.  Countrywide was

aware that the increasingly poor quality of the Company's loans would prevent the profitable sale of those loans into the mortgage market and impair Countrywide's liquidity. Rather than disclosing the risks regarding Countrywide's loans, Defendants Mozilo, Sambol and Sieracki touted Countrywide's loan quality.

89.     By no later than 2006, Defendants Mozilo and Sambol were on notice that, due to anticipated defaults stemming from the Company's non-conforming loans, Countrywide's loan products might not continue to be saleable into the secondary market. Countrywide did not disclose this.

90.     In September 2006, Defendant Mozilo wrote an email to Sambol warning that he believed that certain loans were "mispriced" in the secondary market and that the pricing spread could disappear quickly if there were a negative event in the market.

91.     Indeed, On December 7, 2006, Defendant Mozilo circulated a memorandum to the board of directors of Countrywide and all Countrywide managing directors, including Defendants Sambol and Sieracki, in which he made the observation that Countrywide expected that subprime loans originated in 2006 would be the worst performing on record, driven by wider guidelines and the worsening economic environment, which included rising interest rates and declining home values.

92.     On February 2, 2007 Countrywide Risk Managements warned Defendant Sambol that guideline expansions could disrupt the secondary market for subprime MBS.

93.     These findings by the SEC, among others, illustrate that Countrywide had knowledge that the Mortgage Loans underlying the Certificates were of higher-risk than indicated in the Offering Documents

## VII.    RELIANCE AND DAMAGES

94.     Many of Putnam Bank's Certificates have experienced high level of defaults.

95.     Moreover, the ratings given to the Certificates have significantly deteriorated. Most of Putnam Bank's investments initially received the highest possible ratings - S&P's AAA rating or their equivalent from the other rating agencies. According to S&P's website, "An obligation rated `AAA' has the highest rating assigned by Standard & Poor's. The obligor's capacity to meet its financial commitment on the obligation is extremely strong." Moody's similarly describes its highest rating, Aaa, as meaning that the investment is "judged to be of the highest quality, with minimal credit risk." This is the same rating typically given to bonds backed by the full faith and credit of the United States government, such as treasury bills. Historically, a AAA rated security had an expected loss rate of less than .05%.

96.     Because of the high delinquency and default rates and other factors, seven of Putnam Bank's Certificates have been downgraded from the highest possible ratings to non-investment grade status.

97.      In making the investments, Putnam Bank and the Class relied upon Countrywide's representations and assurances regarding the quality of the mortgage collateral underlying the Certificates, including the quality of Countrywide's underwriting process whereby it generated the underlying loans. Putnam Bank and the Class received, reviewed, and relied upon the Offering Documents, which described in detail the Mortgage Loans underlying each offering.

98.     In purchasing the Certificates, Putnam Bank and the Class justifiably relied on Defendants' false representations and omissions of material fact detailed above, including the misstatements and omissions in the Offering Documents.

99.     But for the misrepresentations and omissions in the Offering Documents, Putnam Bank and the Class would not have purchased or acquired the Certificates, because those representations and omissions were material to its decision to acquire the Certificates, as described above.

100.     The false and misleading statements of material facts and omissions of material facts in the Offering Documents directly caused Putnam Bank and the Class damage, because the Certificates were in fact far riskier than Countrywide had described them to be. The loans underlying the Certificates experienced default and delinquency at very high rates due to Countrywide's abandonment of its underwriting guidelines.

101.     Putnam Bank and the Class have incurred substantial losses in market value and lost principal and interest payments, due to the poor quality of the collateral underlying the Certificates. The income and principal payments to which Putnam Bank and the Class are entitled have been lower than they expected and lower than the payments to which they are entitled under the waterfall provisions of the securitizations.

102.     The disclosure of irregularities in Countrywide's underwriting practices and increased risk regarding future cash flow has also led to a substantial decline in market value of the Certificates. Putnam Bank and the Class purchased the Certificates not only for their income stream, but also with an expectation of possible reselling the Certificates on the secondary market. Putnam Bank and the Class thus viewed market value as a critical aspect of the Certificates it purchased. Putnam Bank and the Class incurred substantial losses on the Certificates due to a drastic decline in market value attributable to Countrywide's misrepresentations which, when disclosed, revealed that the Mortgage Loans likely had a substantially higher risk profile than investors were led to believe.

103.     Putnam Bank's and the Class's losses on the Certificates have been much greater than they would have been if the loans were as Countrywide described them to be. For example, the fact that the loans were not applied to owner-occupied properties at their claimed rate made them more prone to default. Owners who do not occupy their properties are more likely to default on their loans, which made the Certificates poorer investments, accelerated the Certificates decline in value, and greatly worsened Putnam Bank's losses.

104.     The drastic and rapid loss in value of Putnam Bank's and the Class's Certificates was primarily and proximately caused by Countrywide's issuance of loans to borrowers who could not afford them, in contravention of the prudent underwriting guidelines described in the Offering Documents.  These rates of delinquency and default were much higher than expected for securitizations supported by collateral fitting Countrywide's representations, and much higher than they would have been if the Mortgage Loans had been properly underwritten. The drastic increases in delinquency and default on the Mortgage Loans were not attributable to the recent decline in the American housing market, but rather due to Countrywide's wrongdoing.

## VIII.   <u>TOLLING OF CLAIMS</u>

105.     On November 14, 2007, a class action was filed against various Countrywide entities, former officers, and underwriters on behalf of all investors who purchased or otherwise acquired certain mortgage-backed securities that were issued, underwritten or sold by Countrywide. *See Luther v. Countrywide Home Loans Servicing LP,* BC380698 (Cal. Super. Ct. 2007). The *Luther* complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

106.     Among the Certificates that Putnam Bank purchased, the following were included in the November 2007 *Luther* class action: CWALT 2005-43, CWALT 2007-1T1, and CWALT 2007-12T1. Putnam Bank was expressly stated to be part of the defined class in *Luther,* as of November 14, 2007, with respect to these Offerings.

107.     On June 12, 2008, another securities class action was filed against Countrywide in California state court, *Washington State Plumbing & Pipefitting Pension Trust v. Countrywide Financial Corp.,* BC392571 (Cal. Super. Ct. 2008). Like *Luther,* this action also alleged Section 11, 12(a)(2), and 15 claims against Countrywide, its former officers, and underwriters, although *Washington State Plumbing* based its claims on different securitizations than those in *Luther.*

108.     Among the Certificates that Putnam Bank purchased, the following were included in the June 12, 2008 *Washington State Plumbing* class action: CWALT 2005-43, CWALT 2007-1T1, CWALT 2007-12T1, CWHL 2006-HYB2, CWHL 2006-12, CWHL 2007-J2, CWHL 2007-17 and CWALT 2007-25. As in *Luther,* Putnam Bank was expressly stated to be part of the defined class in *Washington State Plumbing,* as of June 12, 2008, with respect to these Offerings.

109.     On September 9, 2008, the *Luther* complaint was amended to add the securitizations from *Washington State Plumbing* to the *Luther* class. The *Washington State Plumbing* action was consolidated with the original *Luther* action, and a consolidated and amended complaint was filed on October 16, 2008. Putnam Bank was included in the defined class in the *Luther/Washington State Plumbing* consolidated complaint with respect to investments in the following Offerings: CWALT 2005-43, CWALT 2007-1T1, CWALT 2007-12T1, CWHL 2006-HYB2, CWHL 2006-12, CWHL 2007-J2, CWHL 2007-17 and CWALT 2007-25.

110.     The consolidated *Luther* action was subsequently dismissed on jurisdictional grounds in January 2010 and refiled that month as *Maine State Retirement System v. Countrywide Financial Corp., No.* 10 Civ. 0302 (C.D. Cal. 2010). Putnam Bank was included in the defined class in the *Maine State* complaint with respect to investments in the following Offerings, the same Offerings in the *Luther/Washington State Plumbing* consolidated complaint: CWALT 2005-43, CWALT 2007-1T1, CWALT 2007-12T1, CWHL 2006-HYB2, CWHL 2006-12, CWHL 2007-J2, CWHL 2007-17 and CWALT 2007-25.

111.     In a November 4, 2010 decision, the *Maine State* court held that the named plaintiffs in the class action had standing to sue Countrywide only with respect to 81 of the offerings in which the named plaintiffs themselves invested. *Maine State Retirement System v. Countrywide Financial Corp.,* No. 10 Civ. 0302 (C.D. Cal. Nov. 4, 2010) (opinion), at 7. The court rejected the notion that the plaintiffs could represent class members who bought in other Countrywide offerings, even if the offerings emanated from a common

registration statement. The net effect of the court's ruling is to narrow the *Maine State* class and to exclude class members whose investments in Countrywide mortgage-backed securities do not overlap with those of the named plaintiffs. *Id.* at 5-8.

112.    Some of Putnam Bank's investments were made in the same Offerings as the named plaintiffs in the *Luther, Washington State Plumbing, and Maine State.* These Offerings include CHL 2006-12.

113.    However, certain other of Putnam Bank's Countrywide investments appear not to overlap with the investments of the named plaintiffs (though Putnam Bank cannot be certain of this because the *Luther* complaint does not list the individual purchases of plaintiff David Luther). Nonetheless, it appears that the Court's standing ruling may have the effect of involuntarily excluding Putnam Bank from the Countrywide mortgage-backed-securities class action, at least with respect to certain of its investments.

114.    Because of the uncertainty arising from this ruling, Putnam Bank has chosen to file this separate action and to assert its and the Class's 1933 Act claims, which have been tolled by the pendency of the various Countrywide MBS class actions. Putnam Bank has been part of the putative class in all of the Countrywide class actions, from *Luther* to *Washington State Plumbing* to *Maine State.* Putnam Bank reasonably and justifiably relied on the named plaintiffs in these class actions to protect its rights and it reasonably and justifiably relied on the class action tolling doctrines of *American Pipe* and *WorldCom* to toll the statute of limitations on its 1933 Act claims.

115.    Under *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974), all putative class members are treated as if they filed their own individual actions until they either opt out or until a certification decision excludes them. *Id.* at 255. As the Second Circuit stated in *In re WorldCom Securities Litigation,* 496 F.3d 245, 255 (2d Cir. 2007): "[B]ecause Appellants were members of a class asserted in a class action complaint, their limitations period was tolled under the doctrine of *American Pipe* until such time as

116.     Putnam Bank was a member of the putative class "asserted" in *Luther* and subsequent class actions and its 1933 Act claims are therefore timely pursuant to *American Pipe and In re WorldCom*.

117.     Except for the Bank of America Defendants, Mozilo, and Countrywide Capital Markets, each Defendant in this Complaint was also a defendant in the *Luther* or *Washington State Plumbing* class actions, for the same causes of action asserted herein.

118.     Moreover, the SEC recently made public many of Countrywide's internal documents and communications. These documents demonstrate that Countrywide's underwriting failures were systemic, implicating all of their loans generated at this time. The documents directly concern the exact type of loans, products, and processes underlying Putnam Bank's and the Class's Certificates.  Because the internal Countrywide documents were not available to Putnam Bank and were only made public recently, Putnam Bank and the Class had no way of knowing Defendants representations in the Offering Documents were false.

### FIRST CAUSE OF ACTION
#### (Violation of Section 10(b) and Rule 10b-5)

119.     Putnam Bank realleges each allegation above as if fully set forth herein.

120.     This claim is brought under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.1Ob-5, against Countrywide Home Loans, Countrywide Securities, the Depositors, and the Bank of America Defendants as Countrywide's successors (the "Section 10(b) Defendants"). The Section 10(b) Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon Putnam Bank, in violation of Section 10(b) of the 1934 Act and Rule IOb-5 promulgated thereunder.

121.    The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Securitizations from Putnam Bank, as reflected in the misrepresentations and omissions set forth above.

122.    The Section 10(b) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

123.    As a result of the Section 10(b) Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Putnam Bank was misled into believing that the Certificates were more creditworthy investments than they actually were.

124.    Putnam Bank purchased the Certificates without knowing that the Section 10(b) Defendants had misstated or omitted material facts about the Securitizations. In purchasing the Certificates, Putnam Bank relied directly or indirectly on false and misleading statements made by the Section 10(b) Defendants, and/or an absence of material adverse information that was known to the Section 10(b) Defendants or recklessly disregarded by them but not disclosed in Countrywide's public statements or its communications with Putnam Bank. Putnam Bank was damaged as a result of their reliance on the Section 10(b) Defendants' false statements and misrepresentations and omissions of material facts.

125.    At the time of the Section 10(b) Defendants' false statements, misrepresentations and omissions, Putnam Bank was ignorant of their falsity and believed

them to be true. Putnam Bank would not have purchased or otherwise acquired the Certificates had it known the truth about the matters discussed above.

126.     Putnam Bank is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Putnam Bank's claim, and within 5 years after the violations with respect to most of Putnam Bank's investments.

127.     By virtue of the foregoing, the Section 10(b) Defendants have violated § 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

128.     As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Putnam Bank has suffered damages in connection with the purchase and subsequent decline in value of the Certificates, and in connection with the subsequent sale of certain Certificates for a loss.

<u>**SECOND CAUSE OF ACTION**</u>
**(Violation of Section 20(a) of the 1934 Act))**

129.     Putnam Bank realleges each allegation above as if fully set forth herein.

130.     Each of the Section 10(b) Defendants is liable as a direct participant and primary violator with respect to the wrongdoing discussed herein. Countrywide Financial, Mozilo and Sambol (the "Section 20(a) Defendants"), by reason of their status as parent company and senior executive officers and directors of Countrywide, directly or indirectly controlled the conduct of Countrywide's business and its representations to Putnam Bank, within the meaning of § 20(a) of the 1934 Act. The Section 20(a) Defendants directly or indirectly controlled the content of the Offering Documents related to Putnam Bank's investments in the Securities within the meaning of § 20(a) of the 1934 Act. Therefore the Section 20(a) Defendants are jointly and severally liable for Countrywide's fraud, as alleged herein.

131.     The Section 20(a) Defendants controlled and had the authority to control the content of certain of Countrywide's documents, including the Certificates'

Offering Documents. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Section 20(a) Defendants reviewed or had the opportunity to review those documents prior to their issuance and therefore knew or should have known that those documents contained misrepresentations. The Section 20(a) Defendants reviewed or could have reviewed these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

132.     The Section 20(a) Defendants knew or recklessly disregarded the fact that Countrywide's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Section 20(a) Defendants did not act in good faith.

133.     By virtue of their high-level positions and their participation in and awareness of Countrywide's operations and public statements, the Section 20(a) Defendants were able to and did influence and control Countrywide's decision-making, including controlling the content and dissemination of the documents that Plaintiffs contend contained materially false and misleading information and on which Plaintiffs relied.

134.     The Section 20(a) Defendants had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, as set forth more fully above.

135.     As set forth above, the Section 10(b) Defendants each violated § 10(b) of the 1934 Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Section 20(a) Defendants are also liable pursuant to § 20(a) of the 1934 Act.

136.     As a direct and proximate result of Defendants' wrongful conduct, including the wrongful conduct of Countrywide Financial, Mozilo and Sambol, Putnam Bank suffered damages in connection with its purchase of mortgage-backed securities from Countrywide.

### THIRD CAUSE OF ACTION
### Violation of Section 11 of the 1933 Act
### (On Behalf of the Nationwide Class)

137.    Putnam Bank realleges each allegation above as if fully set forth herein, except to the extent that Putnam Bank expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action specifically excludes the allegations as to Defendants' scienter set forth in above.

138.    This cause of action is based solely on claims of strict liability or negligence under the 1933 Act. This count is predicated upon the Section 11 Defendants' strict liability for making untrue and materially misleading statements in the Offering Documents for the Section 11 Investments identified herein.

139.    This claim is brought under Section 11 against Countrywide Securities, the Depositors, and the Signatories (David Sambol, Eric Sieracki, Ranjit Kripalani, Stanford Kurland, David A. Spector, N. Joshua Adler, and Jennifer Sandefur) (all together, the "Section 11 Defendants") arising from Putnam Bank's purchases of the Certificates.

140.    Each of Putnam Bank's purchases of the Certificates was made pursuant to the false and misleading Offering Documents, including the Registration Statements.

141.    The Offering Documents for the Offerings were materially untrue, misleading, contained untrue statements of material facts, and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. At the time it obtained the Certificates, Putnam Bank did not know of the facts concerning the untrue and misleading statements and omissions alleged herein.

142.    The materially untrue statements and omissions of material fact in the Offering Documents are set forth above.

143.    The Section 11 Defendants caused to be issued and disseminated, directed other parties to disseminate at the time of the filing of the Offering Documents,

and/or participated in the issuance and dissemination to Putnam Bank of materially untrue statements of facts and omissions of material facts, which were contained in the Offering Documents.

144.     The Section 11 Defendants are strictly liable to Putnam Bank for the materially untrue statements and omissions in the Offering Documents under Section 11. The Depositors are liable as issuers of the Certificates, in particular, within the meaning of Section 2(a)(4) of the 1933 Act, 15 U.S.C. §77b(a)(4), and in accordance with Section 11 (a) of the 1933 Act, 15 U.S.C. §77k(a). Countrywide Financial is liable as an issuer, among other grounds, because it formed the Depositors as a limited purpose finance subsidiaries for the purpose of issuing the Certificates and subsequently issued the Certificates via the Depositors.

145.     Defendant Countrywide Securities is liable for its role as the lead underwriter of both Securitizations, in accordance with Section 11(a)(5) of the 1933 Act, 15 U.S.C. §77k(a)(5).

146.     The Signatories are liable for signing the Registration Statements, in accordance with Section 11(a)(1) of the 1933 Act, 15 U.S.C. §77k(a)(1).

147.     The Section 11 Defendants owed to Putnam Bank a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. The Section 11 Defendants failed to exercise such due diligence by failing to conduct a reasonable investigation.

148.     This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Documents and brought within three years of the effective date of the Offering Documents, by virtue of the timely filing of the *Luther, Washington State Plumbing, and Maine State* complaints and by the tolling of Putnam Bank's claims afforded by those filings.

149.     Putnam Bank has sustained damages measured by the difference between the price Putnam Bank paid for the certificates and (1) the value of the Certificates at the time this suit is brought, or (2) the price at which Putnam Bank sold the Certificates in the market prior to the time suit is brought. Putnam Bank's Certificates lost substantial market value subsequent to and due to the materially untrue statements of facts and omissions of material facts in the Offering Documents alleged herein.

150.     By reason of the conduct herein alleged, the Section 11 Defendants violated Section 11 of the 1933 Act and are jointly and severally liable for their wrongdoing. By virtue of the foregoing, Putnam Bank is entitled to damages from each of the Section 11 Defendants.

### FOURTH CAUSE OF ACTION
### Violation of Section 12(a)(2) of the 1933 Act
### (On Behalf of the Nationwide Class)

151.     Putnam Bank realleges each allegation above as if fully set forth herein, except to the extent that Putnam Bank expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action specifically excludes the allegations as to Defendants' scienter set forth above.

152.     This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

153.     This count is predicated upon Defendants' negligence for making untrue and materially misleading statements in the Offering Documents for the following Offerings that Putnam Bank invested in (identified by the name of the Offering and the class): CWALT 2005-43, CWALT 2007-1T1, CWALT 2007-12T1, CWHL 2006-HYB2, CWHL 2006-12, CWHL 2007-J2, CWHL 2007-17 and CWALT 2007-25.

154.     This is a claim brought under Section 12(a)(2) of the 1933 Act, 15 U.S.C. §771(a)(2) ("Section 12(a)(2)"), against Countrywide Securities, the Depositors, and the Bank of America Defendants as the Countrywide Defendant's successor (collectively the "Section 12(a)(2) Defendants") arising from Putnam Bank's purchases of the Certificates.

155.     The Section 12(a)(2) Defendants offered and sold the Certificates to Putnam Bank by means of the defective Offering Documents, including the Prospectuses and Prospectus Supplements, which contained materially untrue statements of facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading. Putnam Bank purchased the Certificates directly from the Section 12(a)(2) Defendants, who both transferred title to Putnam Bank and who solicited Putnam Bank for financial gain.

156.     The materially untrue statements of facts and omissions of material fact in the Offering Documents are set forth above and in the Exhibits.

157.     The Section 12(a)(2) Defendants offered the Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

158.     The Section 12(a)(2) Defendants owed to Putnam Bank the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure that such statements were true, and to ensure that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Section 12(a)(2) Defendants failed to exercise such reasonable care.

159.     The Section 12(a)(2) Defendants knew, or in the exercise of reasonable care should have known, that the Offering Documents contained materially untrue statements of facts and omissions of material facts, as set forth above, at the time of the Offerings. Conversely, Putnam Bank did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Documents at the time it purchased the Certificates.

160.     This action is brought within one year of the time when Putnam Bank discovered or reasonably could have discovered the facts upon which this action is based, and within three years of the time that the Certificates upon which this cause of action is

brought were sold to the public, by virtue of the timely filing of the *Luther, Washington State Plumbing, and Maine State* complaints and by the tolling of Putnam Bank's claims afforded by those filings.

161.     Putnam Bank sustained material damages in connection with its investments in the Securitizations and accordingly have the right to rescind and recover the consideration paid for the Certificates, with interest thereon, in exchange for tendering the Certificates. Putnam Bank hereby tenders its Certificates and demands rescission.

### FIFTH CAUSE OF ACTION
### Violation of Section 15 of the 1933 Act
### (On Behalf of the Nationwide Class)

162.     Putnam Bank realleges each allegation above as if fully set forth herein.

163.     This is a claim brought under Section 15 of the 1933 Act, 15 U.S.C. §77o ("Section 15"), against Countrywide Financial, Countrywide Home Loans, Countrywide Capital Markets, Sambol, and against the Bank of America Defendants as Countrywide Financial's successor (the "Section 15 Defendants") for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above. The Section 15 Defendants were named as defendants in the Third Cause of Action in *Luther,* for "Violation of Section 15 of the Securities Act Against Countrywide Financial, Countrywide Securities, Countrywide Capital Markets and Countrywide Home Loans."

164.     The Section 15 Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of the Section 11 Defendants and the Section 12(a)(2) Defendants, defined above, at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Offering Documents.

165.     The Section 11 and 12(a)(2) Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in and incorporated by reference in the Offering Documents. The Section 11 and 12(a)(2) Defendants lacked

reasonable grounds to believe that such information was accurate and complete in all material respects.

166.    For the reasons set forth above, the Section 15 Defendants had power and influence over the Section 11 and 12(a)(2) Defendants and exercised the same to cause those Defendants to engage in the acts described herein. By virtue of their control, ownership, offices, directorship and specific acts, the Section 15 Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Section 11 and 12(a)(2) Defendants named herein, including controlling the content of the Offering Documents.

167.    The Section 15 Defendants' control, ownership, and position made them privy to and provided them with actual knowledge of the material facts concealed from Putnam Bank.

168.    Neither of the Defendants named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true, were without omissions of any material fact, or were not misleading.

169.    Putnam Bank did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Documents at the time it purchased the Certificates.

170.    By virtue of the conduct alleged herein, the Section 15 Defendants are liable for the aforesaid wrongful conduct, jointly and severally with - and to the same extent as – the entities they controlled for the violations of Sections 11 and 12(a)(2) by the controlled entities.

## SIXTH CAUSE OF ACTION
### Violation of the Connecticut Uniform Securities Act, Section 36b-4
### (On Behalf of the Connecticut Subclass)

171.    Putnam Bank realleges each allegation above as if fully set forth herein.

172.     Defendants disseminated he false and misleading statements in the Offering Documents specified above, which they knew or deliberately disregarded were misleading.

173.     Defendants, in connection with the offer and sale of the Certificates: (1) employed devices, schemes and/or artifices to defraud; (2) made untrue statements of material facts and/or omitted to state material facts necessary to make statements made by Defendants in the Offering Documents, in the light of the circumstances under which they are made, not misleading; and/or (3) engaged in acts, practices, and/or courses of business which operated as a fraud or deceit upon persons.

174.     As a direct and proximate result of defendant's wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchase of the Certificates.

**SEVENTH CAUSE OF ACTION**
**Successor and Vicarious Liability**
**(On Behalf of the Nationwide Class)**

175.     Putnam Bank realleges each allegation above as if fully set forth herein.

176.     The Bank of America Defendants are liable for Countrywide's wrongdoing, in its entirety, under common law, because Bank of America and Countrywide merged or consolidated, because Bank of America has expressly or impliedly assumed Countrywide's tort liabilities, and because the Bank of America Defendants are a mere continuation of the Countrywide Defendants.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff Putnam Bank prays for relief as follows:

An award of damages against Defendants in favor of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.     Rescission and recovery of the consideration paid for the Certificates, with interest thereon, pursuant to the Class's Section 12(a)(2) claim;

   b.      Putnam Bank's monetary losses, including loss of market value and loss of principal and interest payments, on all other claims besides Putnam Bank's Section 12(a)(2) claim;

   c.      Attorneys' fees and costs;

   d.      Prejudgment interest at the maximum legal rate; and

   e.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues triable by jury.


Dated:  January 26, 2011                    Respectfully submitted,

                                            SCOTT + SCOTT, LLP

                                            David R. Scott
                                            SCOTT + SCOTT, LLP
                                            156 South Main Street
                                            Colchester, CT  06415
                                            Tel:  860-537-5537

                                            Geoffrey M. Johnson
                                            SCOTT + SCOTT, LLP
                                            12434 Cedar Road
                                            Cleveland Heights, OH  44106
                                            Tel:  216-229-6088

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Thomas A. Borner, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the Chairman and CEO of Putnam Bank, a federally-chartered stock savings bank, which was founded in 1862 as Putnam Savings Bank.

2.      I am familiar with the allegations in this matter, and authorize the filing of lead plaintiff papers in this matter on behalf of Putnam Bank.

3.      Putnam Bank is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.      Putnam Bank, through various subsidiaries, purchased and/or sold the securities that are the subject of the Complaint as set forth on the attached Schedule A.

5.      Putnam Bank did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.      During the three-year period preceding the date of my signing this Certification, Putnam Bank sought to serve, or served as a representative party or lead plaintiff on behalf of a class in the following private action(s) arising under the Securities Act or the Exchange Act:

> *Maine State Retirement System v. Countrywide Financial Corporation, et al.,* No. 2:10-cv-00302 (C.D. Cal.) (Moved for Lead Plaintiff, but was not appointed. Case is pending/active).

7.      Putnam Bank will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of January, 2011, at Putnam, Connecticut.

Thomas A. Borner
Chairman and CEO
Putnam Bank

1

## Schedule A

| Trust | Tranche | Buy/Sell | Date | Units | Price | Cost Basis |
|-------|---------|----------|------|-------|-------|------------|
| CWHL 2006-HYB2 | 1-A-2 | Buy | 3/2/2006 | 50,000 | $99.98 | $4,990,000.00 |
| CWALT 2005-43 | 5-A-2 | Buy | 2/6/2006 | 23,000 | $100.28 | $2,306,440.00 |
| CWHL 2006-12 | A-2 | Buy | 6/19/2006 | 32,100 | $98.36 | $3,157,302,50 |
| CWALT 2007-1T1 | 1-A-1 | Buy | 1/24/2007 | 50,000 | $100.28 | $5,014,000.00 |
| CWALT 2007-12T1 | A-47 | Buy | 5/18/2007 | 34,100 | $99.78 | $3,402,403.47 |
| CWHL 2007-J2 | 2-A-4 | Buy | 6/7/2007 | 50,000 | $99.00 | $4,950,000.00 |
| CWHL 2007-17 | 3-A-1 | Buy | 8/10/2007 | 50,000 | $100.91 | $5,045,500.00 |
| CWALT 2007-25 | 1-A-4 | Buy | 10/10/2007 | 50,000 | $98.45 | $4,922,500.00 |